Good morning, Your Honor. Good morning. On behalf of Vikram Singh v. Suri, I've appeared before a judge. Ohana, he was a judge before. It's a pleasure being before him today, too. Your Honor, the IJ's decision, which was adopted by the BIA in this matter, must be vacated because it's a misstatement of asylum law and misstates precedent case law from the circuit. Maybe you could help me with something that I'm curious about. Like the immigration judge, I find it very unlikely that the Punjab police would recruit a suspected terrorist and then train him and promote him in dealing with military-style weapons. Is there any evidence directly to show that this was a common practice? Yes, Your Honor. Basically, during this period of time, what my client testified to under oath and what the State Department records indicate that during the 1980s and 1990s, the state of Punjab was gripped in the middle of a civil war and young Sikhs between the ages of 18 to 22 were suspected by both sides of either Sikh militants or separatists and the police of being on one side or the other. So if they weren't in the police, they would then assume they were part of the other side. And based on that cycle of violence, they had to make a choice. There was no neutrality. You had to either be on one side or the other. And he refused originally to join them, that is the police. He had no, it was his age and being a Sikh, he was periodically picked up by the police in 1987 and accused and warned by the police, either join us or we're going to think you are part of the other side. And his family told him for him to live and survive, he had to join the police. It happened to thousands of individuals and that was one of the reasons why he as a police officer wanted to leave the police force because he was forced as a police officer to pick up young Sikhs like himself and beat them. He refused to do that. He didn't want to do that. And he saw, and you have newspaper articles over there from the LA Times indicating that this was some kind of Frankenstein monster, the Punjab police. It was a law unto itself. It could do, it could kill, it could maim, it could do whatever it wants. The State Department states it burnt up to 5,000 bodies and wouldn't tell the people who these individuals were. So this is not a normal police force, Your Honor. That would be my response to you, that you would assume in a law and order situation or in a country which would respect the law. The Punjab police was notorious. And I guess I thought it hard. They were notorious. They threatened him. They thought he, they accused him of being a terrorist. They said, come over to our side, I'll give you these military weapons, which in turn, if they really thought he was a terrorist, I would assume that they would think he would use them on them. They never gave him the military weapons. They trained him and they showed his alliance with them. They then trained him to normal police, whatever they do, unfortunately. And it was part of his training that he came into these firearms. It wasn't that he was specifically trained. And then he knew, they knew he wasn't a terrorist. This was their form of recruiting to show he wasn't a terrorist, that he proved that. Counsel, I have a slightly different problem with this. If I understand it, he leaves the police, goes AWOL, whatever you call it. We wouldn't consider it AWOL in this country, but I don't know what's done in India. He goes AWOL from the police. And he doesn't come to this country until something like five and a half or six years later. It's a long time from the time any problem ever occurred. If we're saying the police put upon him, it's been five or six years since they ever put upon him. When he files his application, he says, I left the police force. I went to, I think, Bombay. And after Bombay, I went south. And there I contacted an agent who gave me a visa to come, who got me papers so that I could sneak into the United States. That's what he said in his application. When it comes to when it comes to his testimony, the central core of his claim for asylum is totally left out of his application. When it comes to his testimony, he says, well, the real reason was that I went back four and a half years later and got married. And then the police came and raided my father's house four and a half, I guess, five years later. And then I left. So the real core of his claim for asylum is the thing he doesn't mention whatsoever in his application. It all just comes to light at his testimony. The IJ thought that was somewhat troubling. Why can't the IJ decide that's troubling enough for me to think it's just a phony story? I disagree, Your Honor. I know. I didn't make a statement. I asked a question. I'm just saying the IJ didn't find any troubling on his testimony on that fact. Now, he never ever swore to his application. His application was filled up, as you know, hundreds of these applications are filled up by individuals who don't speak English. He did state on the record, as you have clearly indicated, once he escaped from the police, he left the Punjab trying to find sanctuary in other states. The situation as the United States Department of State states, it changed. He came back in 96 to get married. He was the only son of his father. You're just quoting exactly what I said. He said that's not the problem. The problem is, yes, we have cases that say, oh, well, it doesn't matter what people say on their applications. Who cares? But we have cases also that say when there is a tremendous disparity and the major problem is not even mentioned in the application, then that is significant, and an ALJ can rely on it. So what you need to tell me isn't to recount what he said in his testimony. I think I know what he said in his testimony. But your recount is why, why shouldn't we follow cases that say if you leave out your central core, then that's very suspicious. I would agree with you, Your Honor, if he had ever said or he had assumed the facts that you have just stated and said that basically the reason he came back had nothing to do with any claim. That declaration you're relying on wasn't translated. That declaration was not completed by him. And his sworn testimony, there was no inconsistency in that. That was why we mentioned that. You know, I haven't checked precisely, but almost, almost inevitably, the ALJs at the hearings say, is this your application? Is it, is it still true? Do you still swear that that's true? And the people almost always say yes. Did that not happen here? If it happened, Your Honor, there was no translation of the application. There was no, he wasn't given an opportunity. If you're saying, did the judge say, here, why did you say this in your application as you're raising it? Nobody ever raised that with him. I'm saying there was no inconsistency raised. The judge said basically that, and this stated the law. And I would like you and the judges to concentrate on his statement of the law, which is a misstatement of the law. Clear law is that the police can arrest people and beat them up. It's all right. And the other part is that if other Sikhs live peacefully in the rest of India, then there is no harm to this specific individual. That's a clear misstatement of the law. That's what the IJ relied on. He relied on those two central points to make his case in denying this application that Mr. Vikram Singh could live in other parts of India once the police were persecuting him. And that's, I thought he found he was not credible. I thought the IJ found he was not credible. He found some testimony of his not to be credible. He found the portions that you just stated to be credible and he believed he could. And he was relying on the State Department report. And he felt that if the police were looking for him under the matter of R, which was heavily criticized by the circuit, that as a deserter, he deserved to be beaten by the police. The police weren't trying to beat him, they were trying to kill him. Are you saying there's no adverse credibility finding? I'm stating the section that Judge Fernandez just read was not any adverse. The credibility findings was what Judge Nelson raised, was where the IJ found it not credible that the police would try to train him. It was an opinion of the judge. There wasn't any adverse credibility on any statement. The judge felt that he could not find the logic in that. OK, you have used your time. Thank you. Thank you. I'm going to leave the court. I am Ronald LaHotta. I represent the Attorney General, John Ashcroft, in this case. This case is here basically because of the immigration judge's finding in regards to the credibility finding, the lack of credibility of this. They say it lacks the ring of truth. Yes. And as this court also was troubled by certain aspects of the record, the immigration judge was correct. This record does not compel a reversal of that decision. In fact, when one examines this record, it does, in fact, compel the sustaining of the agency's position. Counsel, I take it you were a former immigration judge? If I hear correctly. All right. The immigration judge here stated there were a number of lapses or absences in his assigned claim, but then he didn't go on to say exactly what those lapses or absences were. So don't we have to disregard the adverse credibility finding? Not necessarily, Your Honor. I believe the immigration judge did sufficiently state in this opinion the fact that much of the testimony did not make sense. The bottom line is we don't leave common sense at the door of the courthouse. It's one of the tenets we always used when we were in any kind of a trier of fact situation. And if the court looks at the record, the court can note that the record does sustain this immigration judge's finding. I'm not going to get into analyzing whether it's how I would have done the job or how it could have been done differently. But it was done in such a manner that it was sufficient. The oddity in this case is that the agent submitted a series of documents to the court. They included copies of a passport, which I believe he testified in the hearing, was given to him when the agent took away the original copy. They are in the record. The petitioner testified as well that these are, in fact, accurate, depending on who you ask. Either the agent got it for him 200, I think it was 200 miles south of Bombay, or his father bought it for him, according to another portion. I think his testimony, in fact, was his father bought him the, paid somebody to buy him the passport. But he's maintained that it is his passport. It has his date of birth, his address, and all of this. If one looks at the document itself, I think it's on the administrative record, pages 196 to 197. The court can see that much of the information, in fact, reflects his own personal life, according to his testimony and according to his I-589 asylum application. But it was issued in Jalandhar, which is the state in which he was living, not 150, 200 miles south of Bombay. The other issue that's rather interesting when one looks at that, and the alien, I'm sorry, the petitioner, is the individual who claims that this is his accurate identity document, which he needs to do to apply for asylum. And they also took the position that the visa was also authentic. But on that page, I believe it is at page 335 of the administrative record, in very small stamp type. Is, as a page of the passport, an interesting statement. And this statement basically says, it's on the top half, the holder previously traveled, I think it's on passport number K458461, dated 20 October 1992, at Athens, which has been canceled and reissued. So either this passport is accurate, as he testifies, and he, in fact, traveled on a previous passport to Athens, and then returned to India, or it's not him, in which case we have a real issue with identity. That is also fatal to his claim. So that's in the administrative record itself, page 335. We do note that asylum claims tend to be very difficult, because we have a different country, we have a different political situation, we have a different cultural background, and in many cases, huge economic disparity between this country, at its lowest level, and that country, what potential is available. When asylum claims are presented to the asylum officers and the immigration court, the context is always this person's life, and their claim to asylum. The difficulty of training an individual who is arrested and tortured and harassed and pressured for the better part of three years, and training them in heavy weapons, use of explosives and such, if in fact he was suspected to be a terrorist, as the court correctly noted, doesn't make a lot of sense. If this individual was, in fact, farming with his father and his uncle, and the police were interested in recruiting him as a police officer, the appropriate method, as he indicated, his family also pressured him to join, would have been to have his uncle, who was a two-star sub-inspector, in the same province and the same location, talk to him and convince him of that. It's not credible that the police in that station would take the individual, subject him to the extensive torture that he testifies to when his uncle's over here in the same police department as a two-star sub-inspector, which is one step below the SHO, and I forget what that acronym, but it's like the commandant of the police stations. He also testified in his testimony that he was a rank of a sepoy. Once he was trained, got through the academy, he became a sepoy. And disregarding the historical context from colonial Britain, he also testified that the sepoy was two levels above other police recruits. There was an individual rank of, I think it was a homeland security, homeland, not security, homeland, I can't remember the term, but it was a homeland defense, and then there was a, the record said indiscernible, another level, but he confirmed that he entered two levels above, there are two levels below his rank when he became a police officer, which is not consistent with somebody who had been forced to join the police department after being tortured and electrocuted, et cetera. He also testified that in the sepoy ranks, they go from the sepoy, which is basically like a private, to a last corporal, a corporal, a sergeant, then you have a one-star sub-inspector, inspector or sub-inspector, he used different terms, a two-star, that was the rank of his uncle, and then a three-star. So when you look at the entire testimony of the respondent and the records he has submitted, and he did confirm most of these as being true, the real question then becomes what does make sense, do you take an individual that is connected with a very well-respected agency in terms of the Punjab, do you take that individual and torture him for two or three years to get him to join when his uncle's here as one of the highest ranking police officers in the country? Do you take people in that police department? I submit the answer is no, or do you have an individual who's a farmer, who gets recruited, joins the police, goes on vacation to Athens, returns, and then decides that he really needs to make more money or change his career and come to the United States? This was, the hearing was conducted with an interpreter for him in Punjabi? That's correct. And the abvocation was in? It was in English, but it was translated as well, it's my understanding. Was there ever an attempt in the record to explain some inconsistencies by the language problem? About the language problem? Is there anything in the record to suggest that some of the inconsistencies and the lack of logic here may be due to a problem with language or interpretation? There was a time in the record where there was an explanation of the process, the exchange, the give and take between the interpreter and the petitioner, that he wait until the interpreter complete translating the statement before he say his next statement, because it ends up, they are simultaneous and yet they're somewhat sequential simultaneous. And apparently, from what I gathered, he was stepping on the interpreting, which made it difficult. There was another discussion at another location about the interpreting, about the documents themselves. I don't believe there was a discussion on whether or not the specific documents had been interpreted or translated for him. But I do know much of the inconsistency is based on his own testimony, his oral testimony there, and the differences between where he got the passport, how he got it. And when you look in here and you see that there's a stamp that whoever had this passport went to Athens in 1992, a period in which his testimony was in Bombay, it doesn't ring true. There was one other thing about the immigration judge's opinion that bothered me. He seemed to import into the credibility finding its assessment of the India's changing country conditions. Isn't that improper? Not necessarily. In this particular case, the respondent, sorry, the petitioner, I was in the wrong court for a minute. The petitioner was asked by his counsel whether he was aware that in February of 1997, the government, they had elections in the Punjab and that the Sikh, the Sikh, one of the major Sikh parties had, in fact, succeeded in winning the election and was now the governing body in the Punjab in February of 1997. In the context that he claimed that he had to flee in, I believe it was July of 1997, and that his father's home had been raided, I believe it was in June or such. And this was by his counsel bringing this out. And the context of the background of India, you can't rely solely on that as a basis. But where questions are asked and they don't make sense, the answers don't make sense. I think that's the, I hope that explains the question. Generally, that country condition only goes to future persecution. And he seemed to incorporate it. But thank you. Thank you, counsel. Your time has more than expired. Sharon, I think you have about a minute. I'll give you a minute. Two things to correct Judge O'Hara. Number one, I think Judge O'Hara was testifying right now before the court. There is no information of what is based on speculation and pure conjecture. I would just ask it to be stricken regarding anything dealing with the passport. We would never ever discuss this. There's no record of any of this in the record. The issue before this court, if it is credibility and the record is clear, the application was never translated in Punjabi to this individual, my client. And the judge in the State Department stated that he found my client not to be credible, not from a future, but based on the State Department reports that stated that everybody was loving and hugging everybody in Punjab and India. And that's what he based it on, not on a well-founded fear. He used that. He didn't do an individual analysis. And his reliance on the matter of R was misstated and misguided. Thank you very much. Thank you, counsel. The case just argued is submitted for decision. The next.
judges: Schroeder, Dw Nelson, Fernandez